UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| JACKI HERMAN, | ) | CIV. 11-5091-JLV |
| | ) | |
| Plaintiff, | ) | |
| | ) | ORDER REVERSING |
| vs. | ) | DECISION OF THE |
| | ) | COMMISSIONER AND |
| CAROLYN W. COLVIN, | ) | REMANDING FOR |
| Acting Commissioner, Social | ) | CALCULATION AND |
| Security Administration, | ) | AWARD OF BENEFITS |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

On May 11, 2009, Jacki Herman applied for disability insurance benefits ("DIB"). (Administrative Record, pp. 150-59).[1] Plaintiff alleged a disability onset date of May 1, 2004. (AR at p. 9). After denial of her application, an Administrative Law Judge ("ALJ") held an evidentiary hearing on January 11, 2011. Id. at pp. 27-52. At the hearing, Ms. Herman amended her onset date to October 15, 2007. Id. at pp. 29-30. On March 28, 2011, the ALJ concluded Ms. Herman was not disabled and denied her benefits.[2] Id. at pp. 9-21. The Appeals Council denied plaintiff's

---

[1]The court will cite to information in the administrative record by "AR, p. ____."

[2]The ALJ found Ms. Herman met the insured status requirement for benefits through December 31, 2012. (AR at p. 11).

request for review.  Id. at pp. 1-5.  The decision of the ALJ became the final

decision of the Commissioner.[3]  Id. at p. 1.

Plaintiff timely filed her complaint appealing from the ALJ's decision.

(Docket 1).  Defendant denies plaintiff is entitled to benefits.  (Docket 11).

The court issued a briefing schedule requiring the parties to file a joint

statement of material facts ("JSMF").  (Docket 13).  If there were any

disputed facts, the parties were required to attach a separate joint

statement of disputed facts.  Id.  The parties filed their JSMF.  (Docket 14).

Plaintiff then filed a motion for an order reversing the decision of the

Commissioner.  (Docket 15).  For the reasons stated below, plaintiff's motion

to reverse the Commissioner's decision is granted.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 14) is incorporated by reference.  Further

recitation of salient facts is included in the discussion section of this order.

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by

substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v.

---

[3]Carolyn W. Colvin became the Acting Commissioner of Social Security on
February 14, 2013.  Pursuant to Fed. R. Civ. P. 25(d), Ms. Colvin is
automatically substituted for Michael J. Astrue as the defendant in all pending
social security cases.  No further action need be taken to continue this suit by
reason of the last sentence of section 205(g) of the Social Security Act,
42 U.S.C. § 405(g).

Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  The court reviews the
Commissioner's decision to determine if an error of law was committed.
Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

"Substantial evidence is less than a preponderance, but is enough
that a reasonable mind would find it adequate to support the
Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir.
2006) (internal citation and quotation marks omitted).  Substantial evidence
is evidence that a reasonable mind might accept as adequate to support the
Commissioner's decision.  Choate, 457 F.3d at 869 (quoting Ellis v.
Barnhart, 392 F.3d 988, 993 (8th Cir. 2005)).  The review of a decision to
deny disability benefits is "more than an examination of the record for the
existence of substantial evidence in support of the Commissioner's decision
. . . [the court must also] take into account whatever in the record fairly
detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir.
2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this
court would have decided the case differently, it cannot reverse the
Commissioner's decision if that decision is supported by good reason and is
based on substantial evidence.  Guilliams v. Barnhart, 393 F.3d 798, 801
(8th Cir. 2005).  A reviewing court may not reverse the Commissioner's
decision " 'merely because substantial evidence would have supported an

3

opposite decision.'" Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

"Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [or combination of impairments] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A).

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled.[4] 20 CFR §§ 404.1520(a)(4). If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled. Id. The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the

---

[4]The same five-step analysis determines eligibility for DIB benefits. House v. Astrue, 500 F.3d 741, 742 n.1 (8th Cir. 2007).

4

Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).  The ALJ applied

the five-step sequential evaluation required by the Social Security

Administration regulations.  (AR at pp. 10-11).

## STEP ONE

At step one, the ALJ determined Ms. Herman had not been engaged in

substantial gainful activity since May 1, 2004.[5]  Id. at p. 23;

20 CFR §§ 404.1520(b) & 404.1572.

## STEP TWO

At step two, the ALJ must decide whether the claimant has a

medically determinable impairment that is severe or a combination of

impairments that are severe.  20 CFR §§ 404.1520(c).  The regulations

describe "severe impairment" in the negative.  "An impairment or

combination of impairments is not severe if it does not significantly limit

your physical or mental ability to do basic work activities."  20 CFR

§ 404.1521(a).  Thus, a severe impairment is one which significantly limits a

claimant's physical or mental ability to do basic work activities.

_____

[5]This date is an error.  At the hearing Ms. Herman amended her onset date to October 15, 2007.  (AR at pp. 29-30).  Ms. Herman was not engaged in substantial gainful activity since October 15, 2007.

The ALJ found Ms. Herman had five severe impairments.  (Docket 12 at ¶ 2.1).  Ms. Herman's severe impairments are: "borderline mental functioning, depressive disorder, adjustment disorder with anxiety, lumbar degenerative disc disease, and lumbar facet degenerative joint disease . . . ." (Docket 14 at p. 13).

## STEP THREE

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1 ("Appendix 1").  20 CFR §§ 404.1520(d), 404.1525, and 404.1526.  If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR § 404.1509, claimant is considered disabled.

At step three, the ALJ found Ms. Herman did not meet or was not medically equal to the requirements of any of the impairments in the Listing of Impairments.  (Docket 14 at pp. 13-14).  Focusing on Listing 12.05, "the ALJ found 'the evidence clearly shows that [Herman] has subaverage general intellectual functioning' but that Herman had not proved that she had 'deficits in adaptive functioning' or that her subaverage general intellectual functioning had existed prior to age 22."  Id. at p. 14.  Plaintiff challenges these findings.  (Docket 15).

6

In analyzing the ALJ's decision, the court must first focus on the following preliminary question: Did Ms. Herman satisfy the requirements of the introductory paragraph of Listing 12.05, Mental Disorders?  The introductory paragraph of Listing 12.05 states:

> Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.

Appendix 1, Listing 12.05.  Stated another way, the elements which must be proven are before age 22 does the evidence demonstrate that Ms. Herman had (1) significant subaverage general intellectual functioning (2) with deficits in adaptive functioning?  "[T]he requirements in the introductory paragraph are mandatory."  Maresh v. Barnhart, 438 F.3d 897, 899 (8th Cir. 2006).  However, the introductory paragraph does not require a "formal diagnosis of mental retardation."  Id.

The ALJ concluded "the evidence does not show that [Ms. Herman's] borderline intellectual functioning existed prior to age 22 years old."  (AR at p. 15).  The ALJ based this conclusion on the following findings:

1. Dr. Pelc testified that the medical evidence was inconclusive and he noted that this was a point of contention between the medical experts.

2. [Ms. Herman] has given conflicting reports regarding her academic performance . . . .

7

A.   During the extensive examination with Dr. Arnio, she reported that she did well in school and was never in special education classes. . . . The claimant's mother confirmed these statements.

B.   [D]uring the less extensive examination with Dr. Swenson [Ms. Herman] reported significant problems in school, that she had been retained during several grades, and that she was in special education.

3.   [Ms. Herman's] school records do not contain any information regarding the claimant's behavioral issues in school.

4.   [Ms. Herman] earned very low grades, but there is no evidence that she was . . . in special education.

5.   [S]ince the records only contain [Ms. Herman's] grades, there is no way to determine if [her] poor grades were the result of a learning disability or a lack of interest or effort in school.

Id. The conclusion of the ALJ is not supported by the substantial weight of the evidence. Choate, 457 F.3d at 869; Cox, 471 F.3d at 906.

During the administrative hearing, Ms. Herman testified:

Q    [H]ow far did you go in school?

A    To the ninth grade, first quarter of the ninth grade.

Q    How old were you when you dropped out?

A    17.

Q    Do you know what grades you had to do over?

A    I remember third grade.  I know I was back a couple years when I went to junior high.

8

Q      When you went to school, were you ever in classes for special ed, as opposed to the regular classes?

A      Yes.

Q      Do you know what grade that would have been?  Or grades?

A      I would say probably—from probably fifth all the way up to eighth grade.

(AR at pp. 44-45).

The ALJ questioned Ms. Herman further about her educational background:

Q      Do you remember what school you went to?

A      I went to—in my younger grade schools, I went to Horace Mann.

Q      It that here in Rapid City?

A      Yes.

Q      And where did you go to the junior high or middle school?

A      I went to Jefferson School.

Q      Is that also here?

A      Yes.  And then the high school, I went to Douglas . . . Douglas Junior High.  Douglas High School.

Id. at p. 47.  Ms. Herman's attorney identified Jefferson as a "special school."  Id.  The ALJ then asked:

Q      What kind of special school?

A      Special education.

9

Q      Oh, is it?

A      Yes.

<u>Id.</u> at p. 48.  The ALJ then agreed to obtain Ms. Herman's "testing scores and grade scores."  <u>Id.</u>  "I'm going to ask our staff to get grade records and any testing scores that were—that may be available from Douglas, Jefferson, and Horace Mann Schools here in Rapid City.  I was unaware that there was a special school, like Jefferson, and that is evidence of some sort that these problems existed prior to age 22, I think."[6]  <u>Id.</u> at p. 51.  Ms. Herman then volunteered "I went to South Canyon School, too, and they had their special education there, you know, in my younger days."  <u>Id.</u>

Ms. Herman's "very low grades" recorded in the school records indicate while a sixth grader at South Canyon Elementary School she attended 79 of 89 days.  (Docket 14 at p. 2).  In the classes of reading and phonetics, arithmetic, English and literature, social studies, and science her grades were "F."  <u>Id.</u>  The other grades shown on that report card for the first and second nine weeks of the school year were: "S" [satisfactory] in writing and art; "B.S." [below satisfactory or grade "B" and "satisfactory"]  in physical education and health; and a "B" and "C" in vocal music.  (AR at p.

---

[6]The school records were obtained after the hearing.  (AR at p. 15).  Because the schools' document retention policy requires them only to keep records for five years, the record consists of six pages.  <u>Id.</u>; <u>see also</u> Exhibit 26E, AR at pp. 338-43.

342).  Ms. Herman's "deportment" for both sessions was "S."  Id.  The report card indicates Ms. Herman was "[t]ransferred to Robb. Sp. Ed. Date 74/2/4."[7]  Id.

While at Jefferson Junior High, Ms. Herman's grades were "F" in reading and phonetics, arithmetic, English and literature, social studies, science, and spelling.  (AR at 340).  Her grades in art and "spelling in other written work" were "S"; while her grades in physical education were "C" and music were "C" and "B."  Id.  Ms. Herman's "deportment" was "S."  Id.

Ms. Herman transferred from Jefferson Junior High School[8] in Rapid City to the Douglas School System on August 23, 1997.  (Docket 14 at pp. 2-3).  At the time of her transfer to Douglas High School, the record indicated she would be entering the ninth grade.  Id.  at 339.  The last page of her school record reflects Ms. Herman withdrew from Douglas High School on October 5, 1977.  Id. at p. 338.  At the time of withdrawal, Ms. Herman had "NC" [no credit] in all of her classes.  Id.

_____

[7]The court informally inquired of counsel whether "Robb. Sp. Ed." refers to "Robbinsdale Special Education" or to some other "Sp. Ed." program.  (Docket 21-1).  The Commissioner's response was "[she] cannot stipulate to any facts that cannot be clearly discerned from the record.  Beyond what is contained in the record, the Commissioner does not have any knowledge of the facts surrounding Plaintiff's education."  (Docket 21 at p. 4).

[8]The court made a similar informal inquiry of counsel whether Jefferson Junior High School was the special education school for the Rapid City District in 1977.  (Docket 21-1).  The Commissioner gave the same response.  (Docket 21 at p. 4).

These school records disclose Ms. Herman's academic class grades were not only "very low" as reported by the ALJ but, in reality, she failed every academic class.  This supports Ms. Herman's testimony as to why she was required to repeat the earlier grades.  "Satisfactory" results in physical education, music and art, and deportment show she was engaged and was making an effort to succeed.

Dr. Greg Swenson, a Ph.D. psychologist, performed a psychological evaluation of Ms. Herman on January 5, 2006.  (Docket 14 at p. 3).  Ms. Herman reported she "disliked school and struggled academically.  [She] believes she was retained in the third and fourth grade . . . [and] qualified for special education services."  Id.  Ms. Herman told Dr. Swenson she quit attending school in ninth grade because she was pregnant.  Id.  Dr. Swenson reported Ms. "Herman's full scale IQ at 65, or equivalent to the first percentile."  Id. at p. 4.  Dr. Swenson concluded " 'since [Ms. Herman] indicated a history of difficulty with academic work and retention in several grades in school, as well as qualification for special education services, it is reasonable to conclude [her] intellectual limitations are developmental in origin.' "  Id. at pp. 4-5.

In February of 2010, Dr. Swenson stated Ms. Herman's 2006 testing results of reading and mathematical abilities at or below the fourth grade level were consistent with the educational struggles she reported while in

school.  Id. at pp. 8-9.  Dr. Swenson reconfirmed Ms. "Herman's January 2006 IQ test scores were valid."  Id. at p. 9.  Dr. Swenson concluded Ms. Herman "has significantly sub-average intellectual functioning with deficits in adaptive functioning, that have manifested themselves throughout her development, and prior to the age of 22 . . . ."  Id. at p. 9.

Dr. Robert Arnio, a Ph.D. psychologist, evaluated Ms. Herman in late 2006.  Id. at p. 3.  Ms. Herman's mother told Dr. Arnio that her daughter was never enrolled in special education classes in high school.[9]  Id. According to Ms. Herman's mother, her daughter "liked math and was getting a grade of C when she left school [and] was passing her classes in high school when she was forced to leave because of her pregnancy."  Id. After testing, Dr. Arnio reported Ms. Herman had a "full scale IQ of 66."  Id. at p. 6.  He was concerned about the accuracy of the results, questioning whether Ms. Herman "actually tried to answer questions honestly and accurately during the examination."  Id. at p. 19.

In December of 2009, Dr. Dewey Ertz, an Ed.D. psychologist, evaluated Ms. Herman.  Id. at p. 4.  Ms. Herman told Dr. Ertz she attended elementary school in Rapid City and ninth grade in Box Elder (Douglas High School).  Id.  She was a "slow learner and that she received services through

_____

[9]There is no evidence Dr. Arnio inquired about Ms. Herman's educational status in either elementary or middle school.

an alternative school setting." Id.   Among other diagnoses, Dr. Ertz

concluded Ms. Herman had "mild mental retardation by history." Id. at

p. 7.

The greater weight of the evidence shows Ms. Herman was more likely

than not in special education classes during her developmental years.  The

fact Ms. Herman and her mother gave contradictory statements to Dr. Arnio

does not overcome the clarity of the school records.

A consulting expert, Dr. Pelc, a Ph.D. psychologist, testified at the

administrative hearing.  (AR at p. 30).  After considering the testing

performed [by Dr. Swenson and Dr. Arnio], Dr. Pelc testified "I'm frankly . . .

inclined to say that [Ms. Herman's] IQ is validly below 70 . . . . Swenson's

test score was 65, Arnio's was 66. . . . I think that's a clear interpretation

that can be made from these data." Id. at pp. 34-35.

The ALJ summarized Dr. Pelc's testimony regarding Ms. Herman's IQ.

"Dr. Pelc testified that FSIQ of 65 is probably accurate." Id. at p. 19.  The

ALJ "afforded significant weight to the medical opinions of Dr. Pelc . . . ." Id.

The ALJ concluded there was no "other evidence in the record that suggests

[Ms. Herman] has not completed assessment testing to the full–extent of her

abilities[]," as suggested by Dr. Arnio.  Id.  The ALJ gave Ms. Herman "the

benefit of the doubt . . . and finds that the IQ assessments are accurate."

Id.  The ALJ concluded "the medical evidence shows that her full scale IQ

14

falls in the borderline intellectual functioning range . . . ." Id. at p. 18 (adopting Dr. Pelc's testimony and Dr. Swenson's report (Exhibit 5F/3, AR at p. 382) (Ms. Herman's "Full Scale IQ 65")).

However, the ALJ failed to properly consider an important part of Dr. Pelc's testimony, particularly in light of the fact Ms. Herman's school records were not available at the time of the psychologist's examination of the record.  Without access to Ms. Herman's educational records, Dr. Pelc testified "I believe, a couple of grades while she was still in elementary school, which if true—and I didn't find an educational record—but if true, would certainly be indicative of problems with adaptive functioning prior to the age of 22."  (AR at p. 34) (emphasis added).  "Dr. Arnio says that the educational history is not accurately reported.  Dr. Swenson says it is.  And I don't have a record to be able to resolve that. . . . [comparing Dr. Arnio's and Dr. Swenson's other test results] . . . . Those are certainly scores that are relatively consistent and often seen with persons who have significantly sub-average intellectual ability."  Id. pp. 34-35 (emphasis added).  Ms. Herman's educational record verifies her academic failure.  Dr. Pelc's testimony should not be ignored or discounted by the ALJ.  Dr. Pelc's testimony confirms if the education record supports Ms. Herman's testimony that she had to repeat "a couple of grades while she was still in

elementary school . . . [that] would certainly be indicative of problems with adaptive functioning prior to age 22." Id. at p. 34 (emphasis added).

The ALJ rejected Ms. Herman's argument "that it should be presumed her current IQ represents [her] IQ prior to the age of 23." (AR at p. 15).  The ALJ reached this conclusion by distinguishing Muncy v. Apfel, 247 F.3d 728 (8th Cir. 2001).  The ALJ recognized "[t]he Court in *Muncy* found that the initial IQ scores were accurate because absent evidence of a change in a person's intellectual functioning, his or her IQ is assumed to remain the same through out his or her life." (AR at pp. 15-16) (referencing Muncy, 247 F.3d at 734).  Distinguishing Ms. Herman's record from Muncy, the ALJ declared Ms. Herman "has not previously been determined to be disabled and there are no conflicting full scale IQ scores.  Therefore, the undersigned has to make the initial determination of whether there is sufficient evidence to find that [Ms. Herman's] condition [IQ score] existed prior to the age of 23.  The undersigned finds that this burden has not been satisfied." (AR at p. 16).  The ALJ erred as a matter of law.  Smith, 982 F.2d at 311.

Even though a person's IQ score is determined "after the developmental period, . . . 'a person's IQ is presumed to remain stable over time in the absence of any evidence of a change in a claimant's intellectual functioning.' " Maresh, 438 F.3d at 900 (citing Muncy, 247 F.3d at 734; also referencing 65 Fed. Reg. 50,753 (2000) ("explaining that the regulations

'permit us to use judgment, based on *current evidence*, to infer when the impairment began.' ") (emphasis added in <u>Maresh</u>).  <u>See also</u> <u>Christner v. Astrue</u>, 498 F.3d 790, 793 (8th Cir. 2007) ("there is some circumstantial evidence to support the fact that Christner's deficiency [full scale IQ of 58] manifested before age twenty-two . . . . Here, like <u>Maresh</u>, there was evidence of manifestation before age twenty-two, including Christner's low-grade dropout and participation in prior special education classes."); <u>Douglas v. Astrue</u>, 341 F. App'x 257, 258-59 (8th Cir. 2009) ("We conclude that the additional evidence Douglas submitted undermines the ALJ's conclusion that Douglas had not shown the required deficiencies in adaptive functioning prior to age 22.") (referencing <u>Maresh</u>, 438 F.3d at 900 (claimant proved mental retardation manifested itself before age 22 when he struggled in special education classes through ninth grade and then dropped out of school) and <u>Muncy</u>, 247 F.3d at 734 (IQ is presumed to remain stable over time absent evidence of change in intellectual functioning)).

There is no evidence in the record to suggest Ms. Herman's intellectual function diminished between her grade school years and her IQ scores in 2006.  "Mental retardation is not normally a condition that improves as an affected person ages."  <u>Christner</u>, 498 F.3d at 794 (quoting <u>Muncy</u>, 247 F.3d at 734).

17

The ALJ concluded "the record does not show that [Ms. Herman] has deficits in adaptive functioning.  This is most clearly evidenced in the statements provided by [her] former employers . . . ."  (AR at p. 13).  The introductory paragraph of Listing 12.05 requires the ALJ to make the determination of "deficits in adaptive functioning" before the age of 22. (Appendix 1, Listing 12.05).  Whether Ms. Herman developed skills in adaptive functioning in her late twenties or forties does not focus on the requirements of Listing 12.05.  "According to the Commissioner, the introductory paragraph of the Listing [12.05] requires that the deficits in adaptive functioning are initially manifested before age 22. . . . This court agrees with the Commissioner . . . . [u]nder the plain language of the regulations, a claimant must demonstrate or support onset of the impairment before age 22."  Maresh, 438 F.3d at 899.

The ALJ rejected Dr. Swenson's opinion, suggesting Dr. Swenson reported Ms. Herman may be mentally retarded under South Dakota law, which is "not consistent with the standards required by the Social Security Administration to meet listing 12.05 . . . ."  (AR at p. 14).  This is a misstatement of Dr. Swenson's report and his ultimate opinion.

There is no mention of South Dakota law in Dr. Swenson's report, rather he stated:

18

In determining the diagnosis of mild mental retardation, my primary criteria consisted of the description of mild mental retardation contained in the DSM-IV[10] and quoted in part:

> "Mild mental retardation: . . . as a group, people with this level of mental retardation typically develop social and communication skills during the pre-school years, have minimal impairment in sensory motor areas, and are often not distinguishable from children without mental retardation until a later age. By their late teens, they acquire academic skills up to approximately the sixth-grade level. During their adult years they usually achieve social and vocational skills for minimum self-support but may need supervision, guidance, and assistance, especially when under unusual social or economic stress. With appropriate supports, individuals with mild mental retardation can usually live successfully in the community, either independently or in supervised settings."

(AR at p. 350). Dr. Swenson concluded, "[t]o summarize, I believe Jacki Herman has significantly sub-average intellectual functioning with deficits in adaptive functioning, that have manifested themselves throughout her development, and prior to the age of 22 . . . ." Id. at p. 351.

Dr. Pelc did not challenge Dr. Swenson's diagnosis or his ultimate opinion.

> [M]y own conclusion . . . is that this lady probably has mild mental retardation. And she maximizes the functionality, based on, you know, some sustained effort, and also, it looks like from what Swenson describes around her job history, she had some support . . . they support people into a competitive, low skilled job situation or unskilled job situation, and they provide a lot of

---

[10]Diagnostic and Statistical Manual of Mental Disorders, 4th Ed.

support so that person can effectively stay in that situation, kind of repetitively doing the same thing.[11]

(AR at p. 36).

The court finds the substantial weight of the evidence is contrary to the findings of the ALJ.[12]  The review of a decision to deny disability benefits "is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed, 399 F.3d at 920 (internal quotation marks and citation omitted).

The court finds prior to age 22 Ms. Herman's IQ was 65 and she suffered with significant subaverage general intellectual functioning with deficits in adaptive functioning.  The court finds Ms. Herman satisfies the introductory paragraph of Listing 12.05.

The next question is whether the record supports a finding Ms. Herman meets any of the four paragraphs of Listing 12.05.  The two paragraphs relevant to Ms. Herman are:

------------------------------------------------------------

[11]Ms. Herman "had a job coach who helped her get started when she first started working at the Black Hills Workshop."  (Docket 14 at p. 2).

[12]Dr. Arnio did not perform a formalized assessment of Ms. Herman to determine if a diagnosis of mental retardation was appropriate.  (AR at p. 14).  A non-examining, consulting psychologist, Dr. Berkowitz, arrived at the same conclusion.  Id.  Dr. Berkowitz premised his opinion on rejecting Ms. Herman's IQ "in the 60s[.]"  (AR at p. 377).  A consulting expert's opinion based on findings contrary to medical evidence cannot be given any weight.

20

C.    A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function;

Or

D.    A valid verbal, performance, or full scale IQ of 60 through 70, resulting in at least two of the following:

1.    Marked restriction of activities of daily living; or

2.    Marked difficulties in maintaining social functioning; or

3.    Marked difficulties in maintaining concentration, persistence, or pace; or

4.    Repeated episodes of decompensation, each of extended duration.

Listing 12.05 of Appendix 1.

The ALJ concluded Ms. Herman did not satisfy the paragraph D criteria of Listing 12.05. (AR at p. 13). "Because [Ms. Herman's] mental impairments do not cause at least two 'marked' limitations or one 'marked' limitation and 'repeated' episodes of decompensation, each of extended duration, the . . . 'paragraph D' criteria of listing 12.05 . . . are not satisfied." (AR at p. 13). Ms. Herman does not challenge this conclusion.

"[T]o meet Listing 12.05C, a claimant must show: (1) a valid verbal, performance, or full scale IQ of 60 through 70; (2) an onset of the impairment before age 22; and (3) a physical or other mental impairment

21

imposing an additional and significant work-related limitation of function."
Maresh, 438 F.3d at 899.  The court has already found Ms. Herman's prior
to age 22 full scale IQ was 65.  The only remaining issue is whether Ms.
Herman has "a physical or other mental impairment imposing an additional
and significant work-related limitation of function."  Id.

"The third requirement of Listing 12.05C is that the claimant has a
physical or other mental impairment imposing an additional and significant
work-related limitation of function, i.e., a 'more than slight or minimal' effect
on the ability to perform work."  Id. at 900.  The ALJ found Ms. Herman had
severe physical impairments of "lumbar degenerative disc disease, and
lumbar facet degenerative joint disease . . . ."  (AR at p. 12).  As the ALJ
noted, a severe impairment "is defined as an impairment or combination of
impairments that significantly limits (has more than a minimal effect on) an
individual's ability to perform basic work activities."  Id.  Ms. Herman
"meets Listing 12.05C."  Maresh, 438 F.3d at 901 (referencing Shontos v.
Barnhart, 328 F.3d 418, 427 (8th Cir. 2003) (reversing denial of benefits
because substantial evidence showed that claimant met Listing 12.05C).

The Commissioner argues Ms. Herman's mental retardation does not
preclude her from working, because "she was at times performing
substantial gainful activity . . . ."  (Docket 16 at p. 15).  "However, [t]he issue
is not whether the claimant can perform gainful activity; rather, it is

22

whether [she] has a[n] ... impairment, other than [her] . . . mental impairment, which provides significant work-related limited function—in other words, whether the second prong of § 12.05(C) is met.' " Maresh, 438 F.3d 897, 901 (8th Cir. 2006) (citing Sird v. Chater, 105 F.3d 401, 403 (8th Cir. 1997) (reversing ALJ's denial of benefits for a claimant who met Listing 12.05C)).

An individual who satisfies the introductory paragraph and one of the subparagraphs of Listing 12.05 is presumed disabled without proceeding to the next step.  20 CFR § 416.920(a)(4)(iii) ("At the third step, we also consider the medical severity of your impairment(s).  If you have an impairment(s) that meets or equals one of our listings in appendix 1 to subpart P of part 404 of this chapter and meets the duration requirement, we will find that you are disabled.").  See also Christner, 498 F.3d at 793 ("A claimant who is found to be mentally retarded under this listing is presumed disabled at step three without further inquiry."); Jones v. Barnhart, 335 F.3d 697, 699 (8th Cir. 2003) ("If the claimant wins at the third step (a listed impairment), she must be held disabled, and the case is over.").

The court finds Ms. Herman meets the requirements of Listing 12.05C and is entitled to benefits.

23

## ORDER

In accord with the above decision, it is hereby

ORDERED that plaintiff's motion (Docket 15) is granted and the decision of the Commissioner of March 28, 2011, is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to the plaintiff Jacki Herman.

Dated March 26, 2012.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
CHIEF JUDGE

24